## Richmond.

## MURPHY'S HOTEL, INC., v. CUDDY'S ADM'R.

### January 16, 1919.

1. CARRIERS—*Elevator—Common Carrier.*—The prevailing doctrine with respect to the duty of one maintaining a passenger elevator in a hotel or other public building is, that he is a common carrier and governed by the same rules as other common carriers. That is to say, (although not an insurer of the safety of his passengers) he is required to exercise the highest degree of care and diligence in the maintenance and operation of the elevator to prevent injury to passengers.

2. CARRIERS—*Presumption of Negligence.*—If an injury to a passenger is caused by an apparatus wholly under the control of the carrier and furnished and applied by it, and the accident is of such a character as does not ordinarily occur if due care is used, the law comes to the aid of the plaintiff and raises a presumption of negligence. The presumption arises, however, from the nature of the accident and the circumstances, and not from the mere fact of the accident itself.

3. CARRIERS—*Presumption of Negligence—Elevator.*—When it is shown that an injured person was a passenger on the defendant carrier's elevator, and that the injury resulted during the operation or movement of the conveyance, a presumption of want of care arises, placing on the defendant the burden of showing freedom from negligence.

4. WITNESSES—*Adverse Witness—Code 1904, Section 3351.*—In an action by an administrator against the owner of a hotel for the death of his intestate, a guest of the hotel, who was killed in an elevator accident, the trial court permitted the elevator operator to be called by the plaintiff as an *adverse witness* and examined according to the rules applicable to the examination and contradiction of such a witness under Code 1904, sec. 3351. The operator was the only eye-witness to the accident. Consequently plaintiff had no choice but to introduce him; and his testimony vindicated the court's ruling in permitting him to be examined as an adverse witness.

   *Held:* That the contention that section 3351 does not apply because witness was not shown to have an *"adverse interest"*

cannot be maintained. The section has expressly been held to apply where the witness has *no adverse interest,* but is shown to be *adverse* or *hostile* to the party introducing him.

5. WITNESSES—*Examination—Discretion of Court.*—Great latitude must be allowed to trial courts in the matter of examining witnesses.

6. CARRIERS—*Elevator—Expert Evidence as to Incompeitence of Operator—Allegation of Declaration.*—In an action against a hotel for death of a guest in an elevator accident, the declaration alleged that the defendant "* * * negligently, recklessly and carelessly employed a certain person to operate the elevator upon which the plaintiff's intestate was a passenger as aforesaid, who was incompetent and should not have been allowed to operate said elevator. By reason whereof," etc.

*Held:* That the court did not err in admitting expert evidence to show the incompetency of the operator from lack of proper instruction, the objection being that no such ground of negligence was charged in the declaration.

7. APPEAL AND ERROR—*Harmless Error—Error Must Be Prejudicial.*—Appellate courts do not sit simply to correct errors. If they did, their work would be unending. To be subject of review the error must be *material,* and must be *prejudicial* to the interest of the party complaining of it.

8. APPEAL AND ERROR—*Harmless Error—Instructions—Elevator.*—In an action against a hotel company for death of a guest in in an elevator accident, the court instructed the jury that defendant's duty in regard to the elevator "applies not only to the manner in which the elevator was being run and controlled by the operator, but also to the machinery, appliances and equipment of said elevator, and the manner in which the same was *constructed* and maintained." The declaration did not charge negligence in the construction of the elevator. It did not appear from the record, nor was it shown in argument, how the insertion of the word "constructed," in the connection in which it occurs, could have injuriously affected the rights of the plaintiff in error, or produced a different result; therefore, the use of the word must be regarded as harmless error.

9. CARRIERS—*Elevator—Persumption of Negligence.*—In the instant case it was not error to instruct the jury that the presumption that the death of a passenger is due to the negligence of the carrier holds until rebutted by evidence satisfactory to the jury.

10. CARRIERS OF PASSENGERS—*Elevator—Care Required of Carrier.*—Carriers of passengers must exercise the "highest prudence;" mere "ordinary prudence" will not suffice.

11. INSTRUCTIONS—*Striking Out Counts of Declaration—Evidence to Sustain.*—Where there was evidence tending to sustain two counts of a declaration, there was no error in the action of the court in refusing an instruction, the effect of which was to strike them out.

12. DIRECTING VERDICT—*Partial Statement of Evidence.*—An instruction directing a verdict upon a partial statement of the evidence was correctly refused.

Error to a judgment of the Circuit Court of the city of Richmond, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The court gave the following instructions:

No. 1. The court instructs the jury that it was the duty of the defendant in carrying the plaintiff's intestate upon his elevator to use the highest degree of care for his safety known to human prudence and foresight, and is liable for the slightest negligence against such human care and foresight might have guarded. This degree of care is required and applies not only to the manner in which the elevator was being run and controlled by the operator, but also to the machinery, appliances and equipment of said elevator, and the manner in which same were constructed and maintained; and if you believe from the evidence that the defendant failed to exercise such care in any of these particulars and that such failure proximately caused the death of the plaintiff's intestate while in the exercise of ordinary care on his part then your verdict must be for the plaintiff.

2. The court further instructs the jury that Murphy's Hotel Company is not an insurer of passengers using elevators and owed to the plaintiff's intestate the exercise of the highest degree of practical care to provide safe equipment and operation and if you believe from the evidence that the defendant in this case exercised such care in the equipment and operation of the elevator in question you will find for the defendant.

27

3.   The court instructs the jury that if they believe the plaintiff's intestate was a passenger on the elevator that his injury was caused by *apparatus* wholly under the control of the defendant and furnished and applied by it, or by some defect in machinery, or appliances, and the accident was of such a character as does not ordinarily occur if due care is used on the part of the owner of the elevator or its employees in charge thereof, then there is a *prima facie* presumption of law that his death was caused by the negligence of the defendant, which presumption holds until the defendant has introduced evidence satisfactory to the jury tending to show that the defendant and its employee operating the elevator used the highest degree of care known to human prudence and foresight in the construction, repair and maintenance of its elevator and appliances and in the running and management of said elevator at the time of the injury.

4.   The court instructs the jury that they must disregard all testimony given by Watts relating to instructions given or not given by him to the elevator boys under his control and further you are instructed that the mere retention in service of a careless employee does not give rise to a cause of action against the employer but there must be evidence of some intervening negligence which is the proximate cause of the injury and the mere employment or retention of an unfit servant cannot be the proximate cause of an accident. There must result some specific act of negligence or incompetency before any liability can attach.

5.   You are further instructed that it is not negligence to fail to take precautionary measures to prevent an injury which if taken would have prevented it, when the injury could not have reasonably been anticipated, and would not have happened but for the occurrence of exceptional circumstances.

6.   You are further instructed that if you believe from the evidence that the plaintiff's intestate was injured in the

elevator and that at the time of the accident the operator was called upon to act, an emergency existed, and that the operator could have used either of the two or more methods of stopping the elevator after the emergency arose, then the defendant company is not liable for the actions of the operator in exercising the right of selection between these methods either of which was shown to be reasonably safe, and you are further instructed that if you believe from the evidence that the operator of the elevator was called on by an emergency created by the plaintiff's intestate, and was in fact attempting to prevent injury to the plaintiff's intestate, then you are instructed that the operator is not held to the same degree of care as he would have been under ordinary circumstances.

7. The court instructs the jury that the testimony of Detectives Kellam and Lumpkin, covering alleged inconsistent statements of witness L. D. Paige, made at the time or shortly after the occurrence of the accident, has no probative value and can be considered by them only for the purpose of discrediting or contradicting the testimony of the said L. D. Paige.

8. The court instructs the jury that you cannot find for the plaintiff under either the second or fourth counts of said declaration herein.

9. The court instructs the jury that *should* they find for the plaintiff then in fixing the damages they should take into consideration all of the circumstances surrounding the case, so far as they are shown in the evidence, such as the circumstances attending the injury, the mental and physical anguish of the deceased, the business habits and earning capacity of the *deceased* as affecting his capacity to earn a livelihood for his family, the loss of the decedent's care and attention and society to his family, together with such sum as they may deem fair and just by way of solace and comfort to them for the sorrow, suffering and mental anguish

occasioned by his death, not to exceed the sum of $10,000.00, the amount sued for.

The court further tells the jury that in such event they should further find the proportions in which the amount of such recovery should be divided between the widow and the infant child.

10.   The court instructs the jury that the burden is upon the plaintiff to prove his case by a preponderance of the evidence and this burden never shifts and if you believe from the evidence in this case that the plaintiff has failed to thus prove his case, you should find for the defendant company.

*C. V. Meredith, James H. Price* and *Gunn & Matthews,* for the plaintiff in error.

*Montague & Lamb* and *F. B. Hutton,* for the defendant in error.

WHITTLE, P., delivered the opinion of the court.

The administrator of Clarence F. Cuddy brought this action against plaintiff in error, Murphy's Hotel, Inc., to recover damages for the death of his intestate, alleged to have been occasioned by the wrongful act of the defendant.

The jury returned a verdict for the plaintiff for $10,000, upon which the judgment under review was rendered.

Cuddy was a resident of Abingdon, Washington county, Virginia, and was deputy sheriff and jailer of that county; he was thirty-one years of age, and a splendid specimen of physical manhood. He came to Richmond on official business, and having registered as a guest at Murphy's Hotel late in the night of his arrival, October 24, 1916, was assigned to room 375 on the third floor. He spent the following day doing some shopping and on that night attended

a performance at one of the theatres where he saw a friend
and fellow-townsman, McConnell, who was likewise a
guest of Murphy's Hotel. Later in the night he and Mc-
Connell again met, in the hotel lobby, where they engaged
in conversation. · McConnell was a merchant in Abingdon,
and had sold Cuddy the shoes he was then wearing. Cuddy
complained that one of his shoes hurt his foot, and McCon-
nell remarked that it might be the lining, and suggested
that he would go up to Cuddy's room and see if he could
relieve the trouble. Accordingly they went to room 375,
and, finding nothing wrong with the lining, McConnell
told Cuddy that he had two pairs of shoes with him and if
he would go down to his room, No. 175, on the first bed-
room floor, two floors below Cuddy's room, he would let
him have a pair of the shoes. The shoes proved satisfac-
tory and the friends continued their conversation, in part on
business, until between two or three o'clock in the morn-
ing, when Cuddy left McConnell's room and went to the ele-
vator door in the hall, with the view of going up to his own
room (but according to the testimony of the elevator ope-
rator he had pressed the down button). In response to the
call the elevator came to that floor. Paige, the night ope-
rator, a colored man twenty-three years of age, had been in
the employment of the hotel since the middle of the pre-
vious September, but had only been operating the elevator
for about two weeks. He was the only surviving eye-
witness to the occurrence, and in the opinion of the trial
court was an adverse witness to the plaintiff; and, over the
objection of defendant, was permitted to be introduced by
plaintiff as such and examined according to the rules ap-
plicable to cross-examination and contradiction in the man-
ner prescribed by Virginia Code, section 3351. Witness gave
substantially the following account of the accident: That
in answer to the call he went up to the first floor; that the
red, or down signal was lit, so when he opened the door

at the first floor, "I said going down sir? The gentleman said, Yes—I closed the door behind him and started the car down. The gentleman gave way in the knees. I had this hand (his left hand) on the lever that operated the elevator. When I saw him give way, I grabbed him with my right hand, and worked the lever with my left hand to stop the car. His foot got down by the floor, the car jumped back and crushed the gentleman's back against the railing across the door, and the handle to it, and then I said —after the car came to a standstill, I opened the door, pulled the lever back and opened the door to let the gentlemen—he fell out in the hall; I opened the door to get him out of the jam. When I opened the door he fell out on his back and left leg—his foot was under the car (indicating) I think, in fact, I know it because the car was about a foot above the floor, and his leg was under there, and I pulled him out. And after I pulled him out I said, 'No need to leave him here,' and I brought the car to the floor, put him in the elevator and carried him to the ground floor, and Mr. Gray, the clerk came around, and we carried him to the first floor, room 151." Witness further stated, that after Cuddy fell out of the elevator on his back in the hall on the floor from which he originally started, that he, witness, propped the door (which closed automatically) open with a chair.

Two police officers, as to both of whom Paige was put on his guard as required by statute, testified that shortly after the accident he made statements to them inconsistent with his testimony as narrated above as to how the accident happened. They testified that when he started down, in response to the down call, witness told them that Cuddy said he did not want to go down, he wanted to go up. Thereupon he reversed the lever and when the elevator started up it jumped, and Cuddy fell against the door and his coat was caught in the back, and his foot got caught in the space between the elevator and the wall of the shaft.

Experts testified that Paige had not been sufficiently instructed to be put in charge of a passenger elevator. And, moreover, that if the elevator jumped in the manner testified to by the witness that it was unquestionably out of order.

Dr. McKinney, who resided in an annex to the hotel, was summoned and arrived on the scene within a few moments after Cuddy had been carried to room No. 151. He found him rational, but suffering "very intensely;" and the only remark he made was: "Doctor, I am dying; do something for me." The doctor gave him a hypodermic and did all that could be done to relieve his pain. He had copious hemorrhages from the bladder, and lived about thirty minutes, dying from "shock and internal injuries; probably suffered a rupture of the kidneys." There was a bruised place on his neck and under his left shoulder; and a very large bruised place across the abdomen near the navel, as if he had been mashed or pressed. "Evidently he had been between two surfaces that pressed or crushed him." The undertaker who embalmed the body took two quarts of bruised blood from the abdominal cavity. Two photographs were taken of decedent's body soon after death, which (in addition to a wound on the ankle and other parts of the left leg and elsewhere, which did not cause his death) disclosed the mortal wound marked by an abrasion extending laterally over the abdomen on a line with the navel.

Aside from the impeachment of Paige's testimony by that of the two police officers. the physical facts demonstrate that his story of how the tragedy occurred was neither truthful nor complete. According to the testimony of the operator, none of the wounds inflicted upon Cuddy at the time that he lifted him into the elevator and carried him down to the office floor was fatal. Yet, without receiving any further hurt, he was taken thence back to the first floor, into room No. 151, where he died within

thirty minutes from the effects of the wound across the abdomen, as to the cause of which witness offered no explanation.  But that tell-tale abrasion across the broken body of deceased supplied the missing link in the chain of Paige's evidence.  Witness' statement had placed Cuddy on his back on the floor of the hallway, with his limbs hanging inside the elevator.  He was then undergoing the agony of having had his left leg lacerated and mashed between the elevator and the side of the shaft; and instinctively would have endeavored to maintain his position, safe in itself, by placing his hands against the sides of the doorway.  While in that position, the negro in his bewilderment and fright (possibly in quest of assistance from the office) lowered the elevator and caught Cuddy's body between the hall floor and the edge of the hood of the descending elevator cage and crushed him.  This is a reasonable hypothesis and one which the jury, enlightened by a view of the premises, was well warranted in adopting from the inevitable circumstances.

From the point of view of a demurrer to the evidence, it is unnecessary to discuss the opposing theory of plaintiff in error inasmuch as it is dependent upon conflicting evidence.

[1] The prevailing doctrine with respect to the duty of one maintaining a passenger elevator in a hotel or other public building is, that he is a common carrier and governed by the same rules applicable to other common carriers. That is to say, (although not an insurer of the safety of his passengers) "he is required to exercise the highest degree of care and diligence in the maintenance and operation of the elevator to prevent injury to passengers.  This principle is maintained by the great weight of authority, including the courts of last resort of all the States of the Union (except perhaps three) and of the Supreme Court of the United States.  A review of the cases would be unprofi-

table, but the subject is fully discussed in notes on liability for injury to elevator passengers found in 2 L. R. A. (N. S.), p. 744, et seq, and 57 L. R. A. (N. S.), 1915-E, p. 722 et seq., where many cases are collected.

[2] It is also well settled law, that "If an injury to a passenger is caused by an apparatus wholly under the control of the carrier and furnished and applied by it. * * * and the accident is of such a character as does not ordinarily occur if due care is used, the law comes to the aid of the plaintiff and raises a presumption of negligence. The presumption arises, however, from the nature of the accident and the circumstances, and not from the mere fact of the accident itself," *Castelano* v. *Chicago & Joliet Elec. Ry. Co.*, 149 Ill App. 250, 253.

This principle has frequently been announced in decisions of this court. *Richmond Ry. etc. Co.* v. *Hudgins*, 100 Va. 409, 41 S. E. 736; *McCrorey* v. *Thomas*, 109 Va. 373, 63 S. E. 1011, *Norfolk So. Ry. Co.* v. *Tomlinson*, 116 Va. 153, 81 S. E. 89; *Walters* v. *N. & W. Ry Co.*, 122 Va. 149, 94 S. E. 182.

[3] So, in *Monahan* v. *Equitable Life Ins. Co. of Iowa*, (Iowa) 156 N. W., p. 994, it was held: "When it is shown that an injured person was a passenger on the defendant carriers elevator, and that the injury resulted during the operation or movement of the conveyance. a presumption of want of care arises, placing on the defendant the burden of showing freedom from negligence."

The following are elevator cases strongly in point, where recoveries were sustained: *Cleary* v. *Cavanaugh*, 219 Mass. 381, 106 N. W. 998; *Orcutt* v. *Cent. Bldg Co.*, 214 Mo. 35, 112 S. W. 532; *Treadwell* v. *Whittier*, 80 Cal. 575, 22 Pac. 266, 13 Am. St. Rep. 175, 5 L. R. A. 498.

The case of *Roanoke Ry. Co.* v. *Sterrett*, 108 Va. 535, 62 S. E. 385, 19 L. R. A. (N. S.) 316, 128 Am. St. Rep. 971, is relied on to reverse this judgment; but the two

28

cases are readily distinguishable. The accident in that case was due to the collapse of a railroad bridge. The analogy between the cases in part is perfect. Both the bridge and elevator were made to order by competent and reliable manufacturers and had been frequently and properly inspected; but at this point the kinship ceases. In the bridge case the accident resulted from an imperfect weld in a supporting cord, and the defect was of a character that the utmost scrutiny could not have detected; while in this case our opinion is that the proximate cause of the accident was the negligence and incompetence of the night operator.

[4] The law of the case having been stated we come next to consider the assignments of error. The first five assignments are to the court's ruling in permitting the elevator operator to be called by plaintiff as an *adverse witness* and examined according to the rules applicable to the examination and contradiction of such a witness under Code, section 3351. As before remarked, Paige was the only eye-witness to the accident. Consequently, plaintiff had no choice but to introduce him; and his testimony vindicates the court's ruling in permitting him to be examined as an adverse witness. The contention that section 3351 does not apply because the witness was not shown to have an "*adverse interest*" cannot be maintained. The section has expressly been held to apply where the witness has *no adverse interest,* but is shown to be *adverse* or *hostile* to the party introducing him. *Gordon* v. *Funkhouser,* 100 Va. 675, 41 S. E. 677; *McCue's Case,* 103 Va. 870, 49 S. E. 623; *Green* v. *Commonwealth,* 122 Va. 862, 94 S. E. 940.

[5] That necessarily great latitude must be allowed to trial courts in the matter of examining witnesses has repeatedly been held by this court. The following cases sufficiently illustrate the rule: *Wickham* v. *Turpin,* 112 Va. 236, 70 S. E. 574; *Abernathy* v. *Emporia Mfg. Co.,* 122 Va. 406, 95 S. E. 418.

[6] The sixth assignment of error is to the action of the court in admitting expert evidence to show the incompetency of the operator from lack of proper instruction, the objection being that no such ground of negligence is charged in the declaration. On the contrary, the fifth count expressly alleges, that the defendant "* * * * * negligently, recklessly and carelessly employed a certain person to operate the elevator upon which the plaintiff's intestate was a passenger as aforesaid, who was incompetent and should not have been allowed to operate said elevator. By reason whereof," etc.

The seventh and last assignment of error is to the giving of plaintiff's instructions Nos. 1 and 3, and the refusal of the court to give some of the prayers offered by the defendant, and the modification of others.

[7, 8] The objection urged to plaintiff's instructions above is to the insertion in each of the word "constructed" or "construction," in telling the jury the degree of care required of the defendant with respect to the elevator that such duty "applies not only to the manner in which the elevator was being run and controlled by the operator, but also to the machinery, appliances and equipment of said elevator, and the manner in which the same was *constructed* and maintained." (Italics supplied.)   The objection is that no count in the declaration charges negligence in the construction of the elevator.   The other objection to instruction No. 3 is that it tells the jury that in order for the defendant to rebut the presumption of law predicated upon their belief of certain facts set out therein, it must introduce evidence "satisfactory to the jury."

It does not appear from the record, nor has it been shown in argument, how the insertion of the word "constructed," or "construction" in the connection in which it occurs, could have injuriously affected the rights of the plaintiff in error, or produced a different result. It must, therefore, be regarded as harmless error. "Appellate courts

do not sit simply to correct errors. If they did, their work would be unending. To be subject of review the error must be *material,* and must *be prejudicial* to the interest of the party complaining of it." Burks' Pleading and Practice, 774; *Supervisors* v. *Gorrell,* 20 Gratt. (61 Va.) 484; *Beirne* v. *Rosser,* 26 Gratt. (67 Va.) at p. 546.

[9] Nor do we think that it was error to say to the jury that the *prima facie* presumption set out in the instruction "holds until the defendant has introduced evidence satisfactory to the jury" tending to rebut the presumption. That was held to be the measure of proof necessary to rebut a similar presumption in the opinion of Buchanan, J., in *Norfolk-Southern Ry. Co.* v. *Tomlinson,* 116 Va. 153, 81 S. E. 89.

[10] There was no error in the rejection by the court of the second paragraph of instruction No. 2, requested by the defendant. The court gave the first paragraph (No. 5 in court's instructions), but refused to give the second paragraph because it only imposed on the defendant the exercise of "ordinary prudence," instead of the "highest prudence," as the law requires. The case of *Va. I. C. C. & C. Co.* v. *Hughes,* 118 Va. p. 741, 88 S. E. 88, from which the paragraph was taken, was a case of master and servant, not of carrier and passenger.

[11] The effect of request No. 6 was to strike out the second, third, fourth and fifth counts of the declaration, but the court modified the instruction so as to make it apply only to the second and fourth counts. In this there was no error. The evidence tended to sustain the allegations of the third and fifth counts and they were rightly retained.

[12] Request No. 8 was also correctly refused. It directs a verdict upon a partial statement of the evidence.

Upon the whole case our conclusion is that it was fairly submitted to the jury on the law, and that the evidence fully sustains their verdict. No reversible error is shown, and, therefore, the judgment must be affirmed.

*Affirmed.*