# Richmond

## JOSEPH L. WATTS V. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY.

March 7, 1949.

Record No. 3416.

Present, Hudgins, C. J., and Gregory, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*John G. May, Jr., Robert Lewis Young* and *Robert Ohnemus*, for the plaintiff in error.

*E. Randolph Williams* and *Wirt P. Marks, Jr.*, for the defendant in error.

STAPLES, J., delivered the opinion of the court.

This writ of error brings under review a judgment of the Law and Equity Court of the City of Richmond, Part Two, which set aside a jury verdict in favor of the plaintiff, Joseph L. Watts, and entered final judgment in favor of the defendant Railroad Company. The action was one to recover for damages sustained by the plaintiff as a result of falling or being thrown from an open vestibule door of a train on which he was a passenger.

The plaintiff, who was an enlisted man in the Navy, along with another naval enlisted man, Chief Grier, was traveling under orders from Brooklyn to Quantico, Virginia. Upon arriving at Washington, they immediately boarded a southbound passenger train of the defendant for Quantico, their destination. They left their baggage in the vestibule of the

car where they entered the train, and went forward in search of seats. Not finding any, the plaintiff's companion went back to stand by the baggage, where he remained. When the train left Alexandria, the plaintiff found a seat three cars ahead of the place where the baggage was left. As will appear, the particular car in which he was seated is material to the issues involved. He had been seated for about fifteen minutes and then went back to get some cigarettes out of his bag. After conversing a few minutes with Grier, he then proceeded to return to his seat in the third car ahead. He testified that after he had passed through the second coach ahead of the place where he had stored his baggage and was passing through the door of that coach to the vestibule, so as to enter the next car in which his seat was located, a sudden lurch of the fast running train, combined with the closing of the door behind him, threw him off balance and he fell or was thrown from the train through the open vestibule door on his left. He was found by employees of defendants, three hours later, lying sixteen inches east of the east rail of the northbound track 3.4 miles south of the flag station Accotink.

While the train consisted of eleven cars, in addition to the locomotive and tender, we are concerned here only with the four cars next behind the engine. The fifth car was the Dolly Madison parlor car, which the plaintiff never entered. The remaining six cars were in the rear of the parlor car and are not involved.

The plaintiff introduced evidence to prove the facts above stated and then rested his case, relying upon the doctrine of *res ipsa loquitur* to establish the negligence of the defendant in permitting the east door of the vestibule to remain open while the train was in transit.

The defendant did not move to strike the plaintiff's evidence, but proceeded to introduce witnesses to rebut any presumption or inference of negligence arising from the happening of the accident in the manner stated.

J. E. Perross, who was car inspector at Richmond, produced an inspection card which showed that all the coaches

on the train were in first class condition when they were inspected shortly after their arrival at Richmond.

The defendant then introduced as witnesses, the engineer, the fireman, the flagman, the baggage master, and the parlor car porter, all of whom stated that they had no duties which required them to leave their respective posts or required their presence in any of the passenger coaches during the run. They all testified that they had no recollection of any unusual roughness in the movement of the train at the point of the accident.

L. Hughes, the train porter, testified on behalf of the defendant that it was his duty to accompany the conductor in the day coaches while he was taking up tickets, and also generally to look after the day coaches; that before leaving Washington he closed all of the vestibule doors on the east side of the train, or saw that they were all shut and securely fastened; that passengers entering or leaving the train at Washington, Alexandria and Quantico, entered or left through the vestibule doors on the west or right side of the train. The northbound track was on the other side. He had no particular recollection of what happened when the train stopped at Alexandria as there was nothing to impress it on his memory. He did not remember whether or not the train stopped at Accotink. He stated he did not open any door on the east side of the train as he had no occasion to do so, and further that he did not know anyone had fallen off the train.

J. W. Usher, the conductor, testified that it was the duty of the trainmen, conductor, and porter, to close the vestibule doors, and that the porter closed them all before leaving Washington; that at the Alexandria station he opened the west vestibule door between the third and fourth coaches from the front, and noticed at the time that the opposite east door was closed; that at Accotink he opened the door on the west side of the vestibule between the second and third cars from the engine, said door having been closed at the time; that at Quantico he opened the vestibule door between the third and fourth coaches that he had previously

opened up and closed at Alexandria, and that at that time the opposite vestibule door on the east side was closed; that he did not open any vestibule door on the east side of the train between leaving Washington and arriving at Quantico, did not know anyone had fallen off of his train, or have any reason to believe that anyone had opened any door on the east side.

The foregoing is a summary of the testimony relied on by the defendant to establish the fact that it discharged its duty to exercise the highest degree of care to see that the vestibule doors of the coaches were kept closed while the train was in motion.

The evidence shows that the conductor and the porter were the only employees of the defendant whose duties required their presence in the coaches during the time the train was traveling from Washington to Quantico. Neither of these witnesses claimed to have made any patrol of the coaches, or to have made any inspection of the vestibule doors after leaving Washington. The porter testified that he had no specific recollection of what happened at Alexandria as there was nothing to impress the occasion on his mind, and he did not know whether the train stopped at Accotink but he saw no open door on the east side of the train at Accotink, or between Accotink and Quantico. He gave no account of where he was during this time and makes no claim to have inspected or examined these doors while in transit to ascertain whether any of them were open.

The testimony of the conductor is substantially to the same effect, though he said he remembered that, when he opened the door on the west side of the vestibule between the third and fourth coaches for the entry and exit of passengers at Alexandria and Quantico, he also noticed the door on the opposite or east side of that vestibule was closed on each occasion. When he opened the west side door of the vestibule between the second and third coaches at Accotink, however, he did not testify that he observed that the east door on the opposite side of that vestibule

was also closed at the time. The only observation he claims to have made of any vestibule door on the east side of the train was incidental to his opening of the door on the opposite side of the vestibule between the third and·fourth coaches, for the taking on or letting off of passengers at Alexandria and Quantico. Neither the conductor nor the porter testified as to when they first learned that the plaintiff had fallen from the train, or that such fact was known to them in time to impress upon their memories the events which occurred on the trip.

The defendant also introduced Donald R. Cutchin, a passenger conductor for the Seaboard Air Line Railroad, as a witness to show that the door through which it claimed the plaintiff fell was opened at Accotink by two soldiers. The accident happened after the train had traveled 4.3 miles south from Accotink. Cutchin testified that he was a passenger in the fourth coach from the engine, this being the coach immediately in front of the parlor car. He said that he had taken his little baby daughter and two little grandchildren to Washington to visit the zoo and was returning with them to his home in Richmond. They were seated in two seats facing each other at the extreme front of the car on its east or left side. He said that he saw the plaintiff, Watts, in Washington when he stepped up on the platform of the car, and again saw him on the platform at Alexandria. He further testified that when the train stopped at Accotink, a flag stop, two soldiers came from behind him in the car in which he was seated and went out to the platform, where he heard the vestibule door on the east side slam open; he then saw the soldiers go across to an R. F. & P. station building near the left or east side of the train and speak to some girls there; he saw the soldiers return when the engineer's whistle blew to call in the flagman, but he did not hear the vestibule door close when they came back. Thereupon the following testimony appears in the record:

"Q. You didn't hear it closed? A. No, sir.

"Q. Now please tell us when you next saw Mr. Watts,

the gentleman here, as the train left or shortly after it left Accotink.

"A. Well, it was some little time, long enough for the train to get up pretty good momentum, 30 or maybe 35 miles an hour. Frankly, I am not in position to give you the speed, but it was three or four minutes after we had left Accotink. Mr. Watts come back to that car door as though he was coming in, but he never come in and he stood there looking through the glass a minute or half a minute and then turned around and on the right side of each vestibule car, the majority of them, as you go out there is what we call a grab handle about that long (indicating) and sits off about 4 inches from the vestibule. He took hold of that grab handle and stood there a little while with his back to me and then he looked to the east and he turned and went that way.

"Q. Did you hear anything under the car after he disappeared in that way?

"A. I definitely heard the rocks hit up under the body of the car.

"Q. Did you hear anything that sounded like a bump or anything like that?

"A. Yes, sir, but it is two things there. I could have heard his body hit under the car or if a rock had gotten under the wheel it would cause approximately the same bump and I can't distinguish which it was.

"Q. After he disappeared in that way did you go to the vestibule to see if he was still there?

"A. I got up after I thought about it a little bit and went to get me a drink of water, which was right there almost at the complete front end of the car, and I walked to the door and took a drink of water and looked over that way and the vestibule door was open and he was gone."

The defendant urges that the doctrine of *res ipsa loquitur* is not applicable to the facts of this case because the train and vestibule doors were not under its exclusive control, it being possible for the passengers to open the doors. But even if this should happen, the defendant might be

guilty of negligence in not discovering the open door and in not closing it. The presumption or inference of negligence arising from the fact that the door was open would apply equally whether it was opened by one of defendant's employees, or whether it was opened by a stranger and the employees negligently failed to discover and close it. We have held the doctrine applicable in cases where a person is injured as a result of a derailment of a train on which he is a passenger. *Norfolk-Southern R. Co.* v. *Tomlinson,* 116 Va. 153, 81 S. E. 89; *Hines* v. *Beard,* 130 Va. 286, 107 S. E. 717. The fact that a stranger may tamper with the rails or the rolling stock of the railroad does not relieve the carrier from the presumption of negligence arising from the derailment. There may be negligence in failing to seasonably discover and remedy the destructive acts of the stranger. We think the same principle applies in the case at bar, as was held by the court below.

But the learned judge of the Law and Equity Court, Part Two, was of opinion that the testimony of the witness, Cutchin, was not inconsistent with any other material facts and circumstances shown in the case, and, therefore, the jury was bound to accept the facts he testified to as true. He, therefore, concluded that any presumption or inference of negligence on the part of the defendant, arising from the fact that the door through which the plaintiff fell was open when it should have been shut, was overcome by Cutchin's testimony that the door of the vestibule between the third and fourth cars was opened by the soldiers only a few minutes before the accident, and that the plaintiff fell through that door.

The plaintiff takes the position that the testimony of Cutchin is not uncontradicted, but is in material conflict with the testimony of the plaintiff as to the place and circumstances under which the accident occurred. He contends that his own testimony shows that he did not fall through the door Cutchin said he did but fell through a door in a different vestibule of the train.

We must therefore examine the testimony of these two

witnesses to determine whether any such material conflict exists.

We think the evidence is reasonably clear that the place where the plaintiff's baggage was left in the custody of his companion was in the vestibule between the fourth coach from the engine and the Dolly Madison parlor car. The plaintiff testified that he had found seats about three coaches forward, which would be in either the car next to the engine, or the one immediately behind that, depending upon whether he counted the car where his baggage was.

The plaintiff's account of the accident was that, after his trip to his baggage to secure some cigarettes, he was returning to his seat in the car ahead, and that, as he was walking towards the front of the train, he opened the forward door of the coach next to the one in which his seat was located. This door probably led to the vestibule between the second and third cars from the engine, though it might have been between the first and second cars. Just as he passed through the door, he said, the train lurched and threw him overboard. The witness, Cutchin, was seated in the forward end of the fourth car from the engine, which was the coach next in front of the parlor car. The plaintiff testified he never was in the parlor car. According to the plaintiff's testimony, therefore, the open door from which he fell, or was thrown, was not the door of the vestibule immediately in front of the witness, Cutchin, but was located in one of the two other vestibules further forward.

Cutchin's account of the circumstances under which the accident happened are also materially at variance with the plaintiff's statement. The plaintiff says that he was moving towards the front of the train and had opened the front door of a car to pass into the vestibule leading to the car ahead, and that, while he was in the act of passing through the door, just as he entered the vestibule, the lurch occurred which threw him from the train. Cutchin stated, however, as we have seen, that the plaintiff approached from the front and was moving toward the rear of the train and, as he reached the forward door of the car in which Cutchin

was seated, he stopped and looked through the door window into the car as though he were contemplating entering; that he later turned his back to Cutchin, caught hold of a grab handle for support, and stood in that position for a few moments. Then, said Cutchin, he looked to his left or east and moved in the direction of the door, which Cutchin said he had heard the soldiers open at Accotink.

It might be inferred from Cutchin's account of the accident that the plaintiff had deliberately walked out of the open door. Therefore, if the jury accepted the correctness of the plaintiff's statement of the happening of the accident, it necessarily followed that the person, if any, seen by the witness, Cutchin, was not the plaintiff. We think, therefore, the jury was justified in disregarding the conflicting account of the witness, Cutchin, as to the place and circumstances, under which the accident occurred.

In addition, there are other features or characteristics of the testimony of this witness which were sufficient to carry the question of its credibility to the jury.

The evidence indicates that the accident happened on August 9, between seven forty and eight o'clock p. m. The lights in the coaches had not been turned on, and, although that late in the evening at that time of the year it is about dusk, Cutchin claimed to have seen the plaintiff sufficiently clear through the glass of the door of the car to identify him positively and without hesitation when the trial took place nine months later. Under these circumstances, the jury was justified in entertaining doubts as to the accuracy of his memory. The reliability of his identification is also brought into question by his statement that he thought the plaintiff had on a blue naval uniform, although, in fact, it was white.

Cutchin's statement, that he "definitely heard the rocks hit up under the body of the car," seems more consistent with a fall from a forward car than from the car in which he was seated. The plaintiff's body landed in the gravel between the northbound tracks. At least half a second must have elapsed between the time the plaintiff's body left the car and the time any rocks thrown by his fall could have

reached the train. Certainly, the jury would have been justi-
fied in so finding. The engineer testified the train was
running about sixty miles an hour at the place of the acci-
dent. This was at the rate of eighty-eight feet per second,
or forty-four feet, about the length of an ordinary coach, in
half a second. The jury might have concluded that any
rocks thrown by plaintiff's body would have struck a car
behind that from which he was thrown.

Furthermore, Cutchin's testimony as to the door having
been left open by the soldiers might have been considered by
the jury as discredited by the statement of the conductor
that, when he opened the west door of this same vestibule
at Quantico, the east door was then closed. Quantico is
twelve and six-tenths miles south of the scene of the acci-
dent, a running time of not over fifteen minutes at the speed
the train was running. Although the witness seems to have
been keenly attentive to the occurrences in the vestibule, he
did not mention this door having been closed by anyone so
soon after the accident, or, in fact, at any time.

The jury would also have been justified, in weighing the
credibility of the witness, to have considered his tardiness in
telling the conductor, Usher, who was an old friend of his,
what he had observed about the accident. His testimony
on this subject was as follows:

"Q. What I am trying to get at how did anyone know
you had any information on the subject of someone falling
off at all?

"A. I believe the first man that I talked to about it was
this Mr. Usher, the R. F. & P. conductor.

"Q. When was that?

"A. That was down at Main Street station. He and
his crew were going north and me and my crew were going
south and we met in the station master's office.

"Q. How long was that after the occurrence?

"A. Several months.

"Q. Now, sir, you are an old conductor, aren't you?

"A. Yes.

"Q. When this thing happened you were satisfied with

the man gone and the door open and hearing something hit the ground—you were satisfied that man had gone out of the train in your own mind?

"A. Yes.

"Q. And being an old railroad man do you mean to tell this Court and the jury that you waited for several months when you knew a man had been thrown out there on those tracks before you ever gave any intimation you knew of it?

"A. You asked me about when I said anything to the representatives afterwards. I was a passenger on that train, sir, and I had three little girls to take care of and that car was full of passengers and I stayed in my seat and Mr. Usher didn't come through the train until way after he had passed Quantico. Then I told him I thought this sailor had fell off the train, but I didn't see him fall off.

"Q. Couldn't you have pulled the cord yourself under those circumstances?

"A. No sir. It is against the law for anybody to pull that cord except to prevent a wreck, as I understand it. Of course, I know how to pull the cord, but when a passenger pulls that cord he is liable to pull out a coupling or derail the train and I was just a passenger on that train.

"Q. You didn't mention it to him at all on the trip that day, did you?

"Mr. Marks: He just said he did.

"Mr. May: Mr. Marks, I am not examining you. If you have any objection—

"Mr. Marks: I do object.

"A. I told him I thought the sailor had fallen off the train.

"By the Court:

"Q. When?

"A. Before he got to Richmond way down between Doswell and Ashland, but I didn't know it; that I saw him go towards the open door and heard the rocks hit under the car."

The conductor, Usher, testified, however, that he was

in the vestibule immediately in front of Cutchin letting passengers on and off the train at Quantico. This would seem to have afforded ample opportunity for Cutchin to inform him of any occurrence of the nature he describes about fifteen minutes after he said it happened.

The defendant contends that the inference or presumption of negligence which arises under the doctrine of *res ipsa loquitur* is overcome by the introduction of evidence which, *if true*, would require a finding that the injury was not caused by any negligence of the defendant. It insists, therefore, that the plaintiff's evidence was not sufficient to carry the case to the jury.

■ If the jury believed the plaintiff fell from the vestibule door between the first and second cars, or between the second and third cars, as his testimony indicated, there is no evidence whatever showing or tending to show when the door was opened or by whom. The cause of the existence of the conditions which resulted in the accident is then wholly unexplained. Clearly, under our decisions, the doctrine of *res ipsa loquitur* applies to a case of this kind. But that does not mean that the burden of proof is shifted to the defendant. On the contrary, it remains incumbent upon the plaintiff to prove facts from which an inference of defendant's negligence may reasonably be drawn. Except in cases where the defendant's evidence can be held as a matter of law to rebut the inference (*Stephens* v. *Virginia Elec., etc., Co.*, 184 Va. 94, 34 S. E. (2d) 374), the question whether such evidence is sufficient is for the jury. In any event, where the defendant introduces evidence, as here, "Unless the evidence as a whole preponderates in favor of the plaintiff on the question of the defendant's negligence, the plaintiff cannot recover. A mere equipoise will not entitle the plaintiff to a verdict." *Hines* v. *Beard, supra*, 130 Va., at page 296, 107 S. E., at page 719.

See also, *Virginia Elec., etc., Co.* v. *Lowry*, 166 Va. 207, 184 S. E. 177, and *Anderson* v. *Sisson*, 170 Va. 178, 196 S. E. 688, where the cases on the subject are reviewed at

length in an opinion by Mr. Justice Hudgins (now Chief Justice).

Upon the whole case, we conclude that the jury's verdict in favor of the plaintiff is amply supported by the evidence. The judgment complained of is therefore reversed and final judgment will be entered here in favor of the plaintiff in accordance with the verdict of the jury.

*Reversed and final judgment.*