# Richmond

## Virginia Transit Company v. Doris Durham.

May 1, 1950.

Record No. 3601.

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore* and *Archibald G. Robertson,* for the plaintiff in error.

*Allen, Allen & Allen,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

Doris Durham obtained a verdict against the Virginia Transit Company for damages sustained when struck by one of its busses. From a judgment in accordance with that verdict, this writ of error was obtained. The litigants will be referred to as plaintiff and defendant, the positions occupied by them in the trial court.

The accident happened on Saturday, June 5, 1948, about 3:00 o'clock p. m., on Grace Street in the city of Richmond. That street extends in an easterly and westerly direction and is what is commonly called a "one-way street." Vehicular traffic moves thereon only in a westerly direction. It is intersected at right angles by 3rd and 4th Streets, of which the latter is the easterly of the two. Movement of traffic upon all of these streets is controlled by signal lights, green, amber and red, suspended in the center of the intersections.

People's Drug Store is located at the northwest corner of Grace and 3rd Streets. Immediately on the corner of this building is a concrete column or pillar, which constitutes a support for the upper stories. Entrance to the drug store on the ground floor is effected by passing to either side of this pillar and thence into the door, which is in the corner and immediately behind it.

Defendant, a common carrier, operates a fleet of passenger busses which traverse Grace Street. While plaintiff was upon the sidewalk at the northwest corner of 3rd and Grace Streets, some three feet from the curb, and walking toward the drug store entrance, a bus, proceeding in a westerly direction, ran upon the sidewalk and struck her down. It then violently collided with the concrete column and there came to rest.

Having proved that she was injured by an instrumentality which was within the exclusive control of defendant, and that the accident was of such nature and character as does not ordinarily occur if due care is used, plaintiff relied upon the doctrine of *res ipsa loquitur* and rested her case. *Norfolk So. Ry.* v. *Tomlinson,* 116 Va. 153, 81 S. E. 89; *Murphy*

*Hotel* v. *Cuddy*, 124 Va. 207, 97 S. E. 794; *Bromm Baking Co.* v. *West*, 166 Va. 357, 186 S. E. 289; *Anderson* v. *Sisson*, 170 Va. 178, 196 S. E. 688; *Danville Community Hospital* v. *Thompson*, 186 Va. 746, 43 S. E. (2d) 882, 173 A. L. R. 525, and *Watts* v. *Richmond, etc., Ry. Co.*, 189 Va. 258, 52 S. E. (2d) 129.

The offending vehicular agency was under defendant's exclusive control. It departed from the designated and usually traveled roadway and entered a forbidden area and there inflicted injury. This was an occurrence which in the ordinary course of things does not happen if the one having exclusive control over the agency uses proper care.

Plaintiff was not here bound to discover or prove the precise act or omission which directly caused the vehicle to run upon the sidewalk. The unusual circumstances surrounding the mishap characterize the occurrence as attributable to negligence on defendant's part.

Having proved that the bus was under defendant's exclusive control and that it entered upon the sidewalk and inflicted injury, the production of evidence that its entry upon that forbidden area was without negligence on its part was thus cast and imposed upon defendant.

Pedestrians walking or standing upon the sidewalk are entitled to assume that they are in a place of safety and where they will not encounter or be struck by vehicular traffic. When a motor vehicle is operated so that it leaves the designated vehicular thoroughfare and enters upon a city sidewalk into an area set aside for the exclusive use of pedestrians and there inflicts injury, the case falls within the maxim, *res ipsa loquitur. Trauerman* v. *Oliver*, 125 Va. 458, 99 S. E. 647.

To absolve itself from the presumption of negligence thus warranted by the facts, defendant undertook to show its freedom from any fault causing the accident. It proved that the bus was equipped with a flexible copper air hose line about 19 inches in length by and through which its foot service brake operates and that after the accident had hap-

pened, a metal cap or fitting which connects with and is soldered over and to the end of the hose line was found pulled loose and broken off. It then contended that the metal cap pulled loose or came off at some point between 4th and 3rd Streets and as the bus approached the latter street. It asserts that the operator was thus deprived of the means of effectively using his foot brake to bring the bus to a stop at 3rd Street in observance of the red light, which he says then confronted him, or to stop in response to a passenger's signal indicating a desire to alight at that intersection, which he also says had been given about the middle of the block.

. Other testimony concerning the signal lights is highly conflicting with that of the operator. Some is to the effect that he entered the intersection on the green light and some that he entered on amber. Yet it is conceded that before running upon the sidewalk the bus collided with an automobile which was going northwardly through the intersection, and which one witness says also entered against an amber light.

Testimony of several expert witnesses was introduced which conclusively established that the flexible air line hose by which the foot service brake was controlled and rendered effective was standard, up-to-date equipment in general use, and that it was manufactured by a reputable company and was the best known type of air line hose used in the passenger motor bus industry. The company further proved that the bus was regularly and effectively inspected and had been examined the night before the accident and nothing found defective or out of order. No character of inspection could have revealed any defect in the solder which held the metal cap to the flexible hose proper or disclosed why it failed and released the cap. Though it was shown that the parting of the cap from the hose allows the air to escape, the air pressure to drop and the braking power to thus become ineffective, even after the unfortunate occurrence, no defect could be found in the hose, cap or solder

other than the ultimate mishap—that is, that the metal cap had come off. Upon careful and minute examination, the experts were unable to detect any defect or account for the failure of the hose, and it was said that such failure was most rare, if *not unheard of*, under the conditions obtaining.

One expert witness, however, did say that he rather doubted whether an air line hose of this character could be knocked loose in an accident and "they are supposed to last for an indefinite length of time unless something unusual happens to them." Yet nothing untoward or unusual was shown to have happened to the bus that day, or that anything transpired which would have even remotely tended to break the solder and sever the cap from the hose proper as the bus proceeded at a moderate speed up Grace Street before it struck the vehicle and violently collided with the concrete pillar. In short, no defect was found, and the cause or reason for its failure was undetermined by the experts. So far as their testimony was concerned, the actual cause, time and place of breakage was left entirely within the realm of speculation and conjecture.

The lay testimony offered to prove that the cap broke from the hose before the bus hit the other car in the intersection, and therefore before its collision with the concrete column was that of the driver of the bus, an interested party, and four witnesses who were passengers on the bus. These several witnesses testified to hearing a noise which sounded like a "backfire" or "blowing noise." However, their testimony is contradictory as to when this noise was heard—some saying in the middle of the block and others saying at or in the intersection of 3rd Street. The operator further said that when he undertook to stop for the red light at 3rd Street and also in response to the passenger's signal, his foot brake was ineffective. Yet he does not claim to have noted any change in his air indicator which was located on the dash board and in plain view, and which indicates the lowering of air pressure when such pressure is in fact subsiding.

With this conflict and uncertainty in the testimony, the jury was warranted in believing either that a noise was not heard or that if heard it could have been any type of several noises often heard when cars and busses are traveling on a busy thoroughfare as this was shown to have been on that Saturday afternoon. Nor was the jury, as we view the evidence, required to unqualifiedly accept the operator's statement and explanation of his inability to effectually operate his foot service brake.

The evidence does, in our opinion, conclusively establish that the bus was properly maintained, serviced and inspected, and that it was also equipped with standard air brake hose line. It does not, however, conclusively prove that the failure of the hose line took place before the collision with the other car. All the facts attending the mishap are not revealed by the evidence. The very vital circumstance of where the bus was when the hose parted is left to inference. It was therefore a justifiable deduction from all the evidence for the jury to conclude that the break in the hose took place either in the collision with the other car or when the bus struck the concrete column. In other words, they were entitled to believe that the parting of the cap from the hose was the result of one of the collisions and not the cause of the collisions.

It will thus be seen that defendant, in its attempt to establish its freedom from negligence, undertook to prove how, why, when and where the hose line broke. It was successful in proving how it broke—*i. e.*, that the solder failed and the cap parted from the flexible part of the hose, but it failed to show why, when or where the mishap occurred.

This being true, no error was committed by the trial court in submitting the case to the jury under the *res ipsa loquitur* doctrine, as "* * * plaintiff is not deprived of the benefit of the doctrine from the mere introduction of evidence which does not clearly establish the facts, or leaves the matter doubtful." 45 C. J., "Negligence", sec. 774, p. 1206.

When the plaintiff has introduced sufficient evidence

to require the application of the doctrine of *res ipsa loquitur*, then to escape liability the defendant must present evidence to prove that the accident was not caused by its negligence. If defendant's evidence is of such a character as to establish conclusively its freedom from negligence, the question of liability is for the court. Otherwise, the question of liability is for the jury under all of the circumstances of the case.

The following instruction was given over defendant's objection:

"The Court instructs the jury that where a person received injuries from some means or instrumentality in the control of the defendant which does not ordinarily occur where reasonable care is used by the defendant, and the injury occurs under such circumstances that the defendant should have the means of determining how it occurs, and the plaintiff does not have this information, then, the jury may infer that the injury was due to some negligence of the defendant. They are not obliged to draw such an inference but may do so. *And, in the absence of evidence satisfactorily showing freedom from negligence, the jury may find a verdict for the plaintiff.* But on the whole case the jury must believe from the preponderance of the evidence that the injury was due to the negligence of the defendant, before they can find a verdict for the plaintiff." (Emphasis added.)

It is assailed as being erroneous and prejudical in two particulars—(1) that the evidence offered by defendant conclusively rebutted any inference of negligence that arose from the facts and circumstances proved by the plaintiff, and (2) that the italicized sentence in the instruction imposed upon defendant the obligation of satisfactorily showing freedom from negligence.

As we have already concluded that the evidence offered by defendant did not conclusively establish that the cap broke from the hose before the bus struck the other car and therefore it was proper for the trial court to submit

the case to the jury under the doctrine of *res ipsa loquitur*, no further discussion of the first objection is necessary.

Defendant, however, says that the italicized sentence in the instruction did more than require it to go forward with the evidence at an intermediate stage of the proof if it sought to relieve itself of the presumption of negligence justified by the proof of circumstances sufficient to warrant an application of the *res ipsa loquitur* doctrine. It is insisted that it placed upon defendant the obligation of satisfactorily showing freedom from negligence upon the entire case and that it is in conflict with the last sentence of the instruction. Additional complaint is also made that in any event, the phrase "in the absence of evidence satisfactorily showing freedom from negligence" imposes a greater burden than requiring proof by a "preponderance of the evidence" and for that reason the instruction is fatally defective.

With these contentions we cannot agree.

In *Danville Community Hospital* v. *Thompson, supra,* defendant insisted that the rule of *res ipsa loquitur* was inapplicable. The court, however, concluded that the facts were such as to justify invocation of the doctrine and gave an instruction similar to the one now attacked which contained a sentence identical in import with that here complained of. Though some of the specific objections now made were not there relied on, the instruction was vigorously assailed. That is made certain by this sentence from the opinion written by Mr. Justice Buchanan, "The giving of that instruction is the basis of the main assignment of error." Yet on the facts of that case, no error was found and the decision was affirmed.

In the case at bar, in its effort to prove freedom from negligence, evidence was produced by defendant to show why the bus went upon the sidewalk. In so doing, it undertook to establish how, why, when and where the hose broke, but the evidence was inconclusive and the vital issues of why it broke and where the bus was when it parted remained jury questions.

The italicized sentence complained of merely required defendant to go forward with the evidence and rebut the warranted presumption of negligence under the proof theretofore offered by plaintiff. It is not in conflict with the last sentence. It has to do with an intermediate stage of the proof and no requirement was imposed that in the final weighing of the evidence, defendant would have to prove itself free of negligence to justify a finding in its favor. The ultimate burden, when all evidence was in, of proving her case by establishing the negligence of defendant by a preponderance of the evidence still rested upon plaintiff.

That the phrase complained of merely required defendant to go forward with the evidence at one stage of the trial and that the final burden of proving its negligence was upon plaintiff was likewise made clear by Instruction No. 3, which reads:

"The Court further instructs the jury that if they believe from the evidence that the bus ran upon the sidewalk and struck the plaintiff while she was on the sidewalk, these facts raise a *prima facie* presumption that the defendant was negligent, but they do not shift the burden of proof. When all the evidence is in the question of whether the defendant was negligent is for the jury to determine from all the evidence. If the jury shall believe from a preponderance of all the evidence that the defendant was negligent and that the defendant's negligence was a proximate cause of plaintiff's injuries, the jury must find for the plaintiff."

Nor do we think, in the setting we find it and as used, the phrase, "in the absence of evidence satisfactorily showing freedom from negligence", imposed upon defendant an undue burden. It is true that approval of somewhat similar language, *i. e.*, "by a preponderance of the evidence and to the satisfaction of the jury", was withheld in *Shiflett* v. *Virginia Ry., etc., Co.*, 136 Va. 72, 116 S. E. 500, and *Ashby* v. *Virginia Ry., etc., Co.*, 138 Va. 310, 122 S. E. 104. The stock phrase by "a preponderance of the evidence" or

language of similar import was said in those cases to be proper and more desirable. However, under the facts in each case the use of the phrase there objected to was held not to constitute reversible error. And here, though we do not give to the language our approval, yet employed and qualified as it was by another part of the same instruction and by Instruction No. 3, we have no difficulty in deciding that its use constituted no prejudicial error.

The trial judge evidently decided, and we think properly so, that the evidence was of such character as to warrant a finding by the jury that the hose line either failed while the bus proceeded along Grace Street or that it broke in one of the collisions. Therefore, in addition to submitting the case to them under the doctrine of *res ipsa loquitur*, he also submitted it on the theory that if they believed that the line failed while the bus was in the street between 4th and 3rd Streets, a finding might still be made in favor of plaintiff, if they further believed from the evidence that the operator was negligent in failing to stop the bus by application of his emergency hand brake after he was apprised of the hose line failure and before the bus struck plaintiff. This, defendant now insists, was error. It says that in such event the operator was required to act in an emergency due to no fault on his part and it is not shown that he was guilty of negligence in what he did or failed to do.

This phase of the case requires that certain evidence not heretofore mentioned because not material to the application of the *res ipsa loquitur* doctrine and the questions hereinbefore dealt with be now briefly recited and weighed.

On the afternoon of the accident there had been a light rain and the usual condition of the street following such an occurrence existed.

Third Street proper is about 41 feet wide, which is exclusive of the 12.5 foot sidewalk. The width of Grace Street is approximately the same and as it approaches 3rd Street, it is about level. At the northeast corner of Grace and 3rd Streets, there is an area commonly called a "safety

zone", seventy-five feet in length, in which busses stop for the receipt and discharge of passengers. The operator said that he had stopped at 4th Street, then started and shifted his gears from low to second and thence to high, and as he proceeded westwardly in the lane just to the right and north of the center line and approached 3rd Street, there were cars parked against the right curb and east of the 75 foot safety zone; that when about the middle of the block "approaching 3rd Street" he received a signal to stop at the intersection and that cars were in front of him at and near 3rd Street awaiting a change of the light from red to green. He describes what happened when he undertook to stop in response to the passenger's signal as follows: "Well, when I applied my brakes I didn't have any. I first mashed the accelerator—I mean the brake pedal and it didn't take and I mashed it on down and it still didn't take. Automobiles were stopped ahead of me for the traffic light and I had to whirl around from behind them to go into the bus stop safety zone and keep on going."

He also testified that he went into the safety zone "to keep from hitting these cars in the back" and continued on into the intersection where his bus collided with the northbound automobile and then proceeded across 3rd Street over the curb and against the drug store column. His testimony is rather indefinite as to just when he heard the noise which he took to be a backfire, yet fairly appraised, it appears that he did not hear that noise until at the time of or after his collision with the automobile.

Upon cross-examination, the operator said that he was driving at a speed of ten or twelve miles per hour and was intending to stop at 3rd Street to discharge the passenger who had signaled, and to do so, he would naturally apply his brake to stop or at least start to make the application thereof before reaching the safety zone. Though he said that cars were standing in front of him at 3rd Street, he also said he was approaching the safety zone and about a bus

length from the intersection when he found he "didn't have any air."

A witness on behalf of plaintiff testified that he had for a while operated this identical bus and was thoroughly familiar with its braking system, and that going at a speed of fifteen to twenty miles per hour, it could be stopped with the hand brake in a distance of thirty-five to forty feet. He was not asked whether the damp condition of the street would have affected the distance in which it could be stopped. As it was traveling at the moderate speed of ten to twelve miles per hour, it is evident that upon reasonably normal conditions, it could have been stopped in less than thirty-five feet. Yet, the operator definitely declined to undertake to say within what distance he could stop the bus with the hand brake under any circumstances or at any given speed.

Nor is the evidence of the operator clear as to just where the bus was in Grace Street when he claims he was first apprised of the fact that his foot brake was ineffective. But, in view of the fact that he had received a signal to stop at the intersection and that cars were standing in front of him in the very lane in which he was traveling awaiting a change of the light, and his other testimony that he would at least start to apply his brake before reaching the safety zone, the jury might have reasonably concluded that he was at or somewhat to the east of the safety zone when he became aware of the failure of his foot brake. He would thus have had at least the 75 foot length of the safety zone and the 12.5 foot width of the sidewalk—a total of 87.5 feet, in which to apply the hand brake and stop the bus then proceeding at the moderate speed indicated before he entered 3rd Street and struck the automobile. Yet it does not appear that he ever cut off the ignition or applied his hand brake before entering 3rd Street.

Defendant contends that under these facts and circumstances, it cannot reasonably be said that he was guilty of negligence causing the collision and ultimate injury to plain-

tiff. It is earnestly argued that the operator was confronted with an emergency for which he was not responsible and that he acted as a reasonable man might have done under the circumstances and is therefore not guilty of negligence. Relying upon the authority of *Jones* v. *Hanbury*, 158 Va. 842, 164 S. E. 545, it insists that the court erred in submitting the case to the jury on this theory because, it is said, the evidence wholly fails to show that a reasonable man might not have done or omitted to do what the operator .did or omitted to do.

Defendant itself requested and obtained an instruction which submitted to the jury the issue of whether or not the. driver was confronted with an emergency in fact. It reads:

"The Court instructs the jury if you believe from the evidence that the operator of the bus was confronted with a sudden emergency without negligence on his part, then he was not required to exercise the same good judgment in such sudden emergency which would have been required of him in the absence of such sudden emergency, but he was required to exercise merely such judgment as an ordinarily prudent person might have exercised in the same or similar circumstances.

"And if you believe from the evidence that the operator of the bus was confronted with a sudden emergency without negligence on his part, then the defendant cannot be held liable for any error of judgment on his part in such sudden emergency, if you believe from the evidence that the operator of the bus exercised such judgment as an ordinarily prudent person might have exercised in such emergency."

It is to be noted that this "emergency instruction" submitted to the jury the factual issue of whether or not defendant's driver was confronted with an emergency and then advised them what was the scope and character of his obligation and duty if they believed from the evidence that he was in reality placed in an emergency not due to his own fault.

As relating to the law of negligence, an emergency

is defined as "an event or combination of circumstances which calls for immediate action without giving time for the deliberate exercise of judgment or discretion * * *." *Mayott* v. *Norcross*, 24 R. I. 187, 52 A. 894; *Morancy* v. *Hennessey*, 24 R. I. 205, 52 A. 1021; *Suter* v. *Kentucky Power, etc., Co.*, 256 Ky. 356, 76 S. W. (2d) 29.

 The jury's inquiry, therefore, was whether or not defendant's driver was in fact confronted with an emergency by the failure of the air line hose. The evidence heretofore recited which discloses the very moderate speed of ten to twelve miles per hour at which the bus was traveling and the distance of 87.5 feet or more in which the operator had for the application of the hand brake and in which to stop the bus before reaching 3rd Street was such as to justify a finding by the jury that no emergency in fact existed but merely a situation which called for reasonably good judgment and prompt action.

Yet, if the conclusion be reached that the parting of the hose which rendered the foot brake ineffective created, under the circumstances and conditions obtaining, an emergency in fact, still the cardinal inquiry to be made is more one of fact than of law. Whether or not the operator acted as a reasonable man might have done in this situation is a question of fact peculiarly proper for determination by a jury. Whether or not there is enough evidence to sustain their factual finding does, in the ultimate event, become a question of law. If reasonable men might differ upon the factual issue presented, then the finding of the jury is conclusive.

If an emergency really existed, then what a reasonable man should or should not have done is in the realm of inference. It is to be ascertained by a fair appraisal of the facts proved and a reasonable consideration of the usual and ordinary reaction of men confronted with similar situations. The composite judgment of a jury in this respect is usually the best means and truest test by which to

ascertain and arrive at the reasonable and proper inference to be ultimately drawn.

The factual conclusion or inference could well have been that the operator acted as an ordinary man would reasonably have acted in the emergency (if it be deemed such). Yet from an overall view of the evidence, we cannot say that the jury was not warranted in finding that his failure to apply his hand brake while he traversed at moderate speed the 87.5 feet or more before the collision with the other car was on his part a failure to act as a reasonable man would have done and constituted negligence and a proximate cause of the injury. That, we think, was the measure of his duty in the premises, and the holding in *Jones* v. *Hanbury, supra*, and similar decisions, which are to the effect that when confronted with an emergency not due to his fault, he is only required to act as a reasonable man *might perhaps* have acted is modified to such effect. 45 C. J., "Negligence", sec. 92, p. 710; 38 Am. Jur., "Negligence", secs. 41 and 194, pp. 686 and 874, and White's Supplement to Thompson's Comm. on Negligence, sec. 195. In short, they could justly conclude that the bus operator did not act as a reasonable man would have acted under the circumstances.

The judgment is accordingly affirmed.

*Affirmed.*